Filed 9/27/13  P. v. Schiro CA6

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H038470 |
| Plaintiff and Respondent, | (Santa Clara County Super. Ct. No. C1073538) |
| v. | |
| ROBERT PAUL SCHIRO, | |
| Defendant and Appellant. | |

A jury convicted defendant Robert Paul Schiro of being involved in a hit-and-run accident that resulted in death or permanent, serious injury.  (Veh. Code, § 20001, subds. (a), (b)(2).)[1]  The trial court sentenced defendant to a three-year prison term.

On appeal, defendant contends:  (1) the evidence at trial did not establish the corpus delicti of the offense apart from defendant's out-of-court statements; (2) defendant was denied the effective assistance of counsel because trial counsel provided damaging evidence against him and failed to object to other damaging evidence; and (3) the trial court erred by refusing to give a mistake-of-fact instruction.

We will affirm the judgment.

---

[1] All further statutory references are to the Vehicle Code unless stated otherwise.

## BACKGROUND

### A.     *Prosecution Case – The Incident*

On the afternoon of April 19, 2009, David Nelson and Ashley Jackson[2] went on a 40-mile bicycle ride.  Nelson and Jackson were competitive cyclists who typically rode for two to four hours at a time, five or six days each week.  That day, they took a route that they rode about two or three times each month.  Nelson rode in front of Jackson, as he usually did, because he was the stronger rider.  Their route took them into Saratoga, on Highway 9, where they rode in the bicycle lane.

At a point about 10 miles from their home, Nelson looked back at Jackson, who was about 100 to 200 feet behind him.  Within 10 to 15 seconds after looking back at Jackson, Nelson was struck by a car and almost knocked down.  The car struck Nelson's left arm, just above the elbow, causing a bruise.  Nelson saw that the car was a silver 7-series late-model BMW.  He saw that the car's passenger-side mirror was dangling by its wires.  Nelson screamed at the car, which veered to the right and slowed down briefly, then accelerated and drove away.

Nelson looked back and saw Jackson laying on the ground with her body half in the bicycle lane and half in the road.  When he reached Jackson, he found her "gargling and unconscious."  Nelson flagged down cars, and someone called 9-1-1.  Nelson administered mouth-to-mouth resuscitation to Jackson.  Paramedics arrived within 10 minutes.

Jackson's injuries included bleeding in her brain, a broken clavicle, broken ribs, palsy to her left side, and damage to her left eye.  Jackson did not remember the incident: she remembered using the restroom at a Starbucks, getting back onto her bicycle, and then being in the hospital.  At the time of trial, Jackson was still affected by her injuries. She had memory problems and was unable to multitask.  She could not look up with her

---

[2] Ashley Jackson married David Nelson following the incident, so at the time of trial she went by her married name, Ashley Nelson.

left eye, which was sluggish and did not fully open, and she had "extreme double vision." The left side of her body was still weaker than the right side, and her left-hand motor skills were "a little off."

### B.    Prosecution Case – Defendant's Statements and Police Investigation

On the evening of April 19, 2009, Jeanette Paulsen saw defendant at a restaurant in Saratoga.  Defendant told Paulsen "that he had just hit a bicyclist."  Defendant said he had "brushed" the bicyclist with the mirror of his car, causing the mirror to dangle.  He had pulled over and looked back, but he had driven away because it looked like the bicyclist was getting up.  He had also driven by the scene about 30 minutes later and seen no one there.  Defendant seemed "shook up."  Paulsen drove defendant home from the restaurant, where he had been drinking.  She noticed that his BMW was not parked outside like usual.  Instead, defendant's Corvette, which was usually parked in the garage, was parked outside.

In late April or early May of 2009, defendant spoke with James Russell, who was the parts and service director for an Acura dealership.  Defendant said that "one of his girlfriends had hit a couple of parked cars . . . and had broken the right side mirror off of [his car]."  Defendant asked Russell to "get one for him."  Defendant asked Russell to "try to buy it out of [the] area" because the police were possibly looking for his car.  Shortly after the conversation with defendant, Russell learned that there had been a hit-and-run accident, and he contacted the police.

On May 15, 2009, police executed a search warrant at defendant's home.  A silver BMW was in the garage; its passenger side mirror was missing.  The wires that would have connected the mirror to the car had been cut.  There was dust on the car, indicating that the car had been parked in the garage for a while.  The mirror was not found during the search.  The police determined that defendant had a suspended driver's license at the time of the incident.

3

Paulsen met defendant at another restaurant on May 26, 2009. Defendant told Paulsen that he was still "shook up." He again told her that he had hit a woman with his car, causing the mirror to break off. He told her that the car had been taken out of his garage by court order. Defendant told Paulsen that he planned to say that the mirror broke off when his son drove the car into the garage.

In approximately June of 2009, David Walker heard defendant discussing the incident. Walker was the office manager at defendant's real estate business. He overheard defendant saying that he had been driving on Highway 9 when a bicyclist "wobbled a little bit" and bumped into his car. Defendant stated that he had pulled over, looked back, thought that the bicyclist appeared fine, and drove on. Walker had noticed that defendant stopped driving his BMW around April or May of 2009.

On April 8, 2010, defendant was in the hospital because of elevated blood pressure. Deputy Justin Harper overheard defendant speaking with a nurse, who asked if defendant had been under a lot of stress. Defendant told the nurse that he had been arrested that day for hitting a girl on a bicycle one year earlier. Defendant said he did not understand why he was being arrested a year later. After the nurse left, defendant told Deputy Harper that "a girl hit the mirror of his BMW."

### C.     *Defense Case*

The defense theory was that defendant's vehicle did not collide with or swerve into Jackson. In support of this theory, the defense introduced evidence tending to show that the mirror had broken off prior to the incident.

An FBI expert in analyzing trace evidence compared debris found on defendant's car with the fibers of Jackson's clothing, bicycle seat, and handle bars. She found no matches. Similarly, an FBI chemist examined defendant's vehicle and Jackson's bicycle and shoes, looking for paint transfer. She found nothing corresponding to a collision.

Criminalist Peter Barnett examined the mirror, which defense counsel had obtained from defendant on July 13, 2011. The fractured pieces of the mirror housing fit

4

together with the fractured frame on defendant's car. The wires also matched up. Barnett noticed a mark on the molding of defendant's garage door. The mirror housing had white paint transfer on it. The paint on the mirror housing matched the paint on the garage door, and the height of the mark matched the height of the mirror. Barnett believed the car was backing up when the mirror broke off. If the car had been moving forward, the mirror would have folded inward rather than breaking off.

Physicist Paul Herman performed experiments to see whether force would cause the side mirror to break rather than fold up. He determined that force applied from the front of the car would not cause the mirror to break off. Backing the car out of the garage could cause the mirror to break off.

### D. Procedural History

Defendant was charged with being involved in a hit-and-run accident that resulted in death or permanent, serious injury to Jackson (count 1; § 20001, subds. (a), (b)(2)), being involved in a hit-and-run accident that resulted in injury to Jackson (count 2; § 20001, subds. (a), (b)(1)), being involved in a hit-and-run accident that resulted in injury to Nelson (count 3; § 20001, subds. (a), (b)(1)), driving with a license that was suspended or revoked due to a conviction for driving while intoxicated (count 4; § 14601.2, subd. (a)), and driving with a license that was suspended or revoked for driving with a blood alcohol concentration of 0.08 percent or more (count 5; § 14601.5, subd. (a)).[3]

Trial began on February 1, 2012. On the second day of trial, defendant pleaded no contest to count 4 (driving with a license that was suspended or revoked due to a conviction for driving while intoxicated), and count 5 was dismissed.

---

[3] The District Attorney filed an amended information that contained great bodily injury allegations (Pen. Code, § 12022.7), but those allegations were subsequently dismissed.

On February 14, 2012, the jury returned its verdicts. The jury found defendant guilty of count 1 (being involved in a hit-and-run accident that resulted in death or permanent, serious injury to Jackson, in violation of section 20001, subdivisions (a) and (b)(2)), and thus it did not return a verdict for count 2, which was charged as a lesser-included offense of count 1. The jury found defendant not guilty of count 3 (being involved in a hit-and-run accident that resulted in injury to Nelson).

At the sentencing hearing on June 18, 2012, the trial court imposed the three-year midterm for count 1, with a concurrent one-day county jail sentence for count 4.

## DISCUSSION

### A.    *Corpus Delicti*

Defendant contends the evidence at trial did not establish the corpus delicti of the offense apart from his out-of-court statements. Specifically, he contends that without his out-of-court statements, there was no evidence that he was "involved in an accident." (§ 20001, subd. (a).)

#### 1.    **Proceedings Below**

The jury was instructed, pursuant to CALCRIM No. 359: "The defendant may not be convicted of any crime based on his out-of-court statements alone. You may rely – you may only rely on the defendant's out-of-court statements to convict him if you conclude that the other evidence shows that the charged crime or lesser included offense was committed. The other evidence may be slight and need only be enough to support a reasonable inference that a crime was committed. [¶] The identity of the person that committed a crime may be proved by the defendant's statements alone. You may not convict the defendant unless the People have proved his guilt beyond a reasonable doubt."

During arguments to the jury, defendant emphasized the corpus delicti instruction and argued there was no independent proof that defendant had committed a crime. In his

6

motion for a new trial, defendant likewise argued that the corpus delicti had not been proven.

### 2. Legal Principles – Corpus Delicti

"In every criminal trial, the prosecution must prove the corpus delicti, or the body of the crime itself – i.e., the fact of injury, loss, or harm, and the existence of a criminal agency as its cause. In California, it has traditionally been held, the prosecution cannot satisfy this burden by relying *exclusively* upon the extrajudicial statements, confessions, or admissions of the defendant. [Citations.]" (*People v. Alvarez* (2002) 27 Cal.4th 1161, 1168-1169 (*Alvarez* ).)

"The independent proof may be circumstantial and need not be beyond a reasonable doubt, but is sufficient if it permits an inference of criminal conduct, even if a noncriminal explanation is also plausible. [Citations.] There is no requirement of independent evidence 'of every physical act constituting an element of an offense,' so long as there is some slight or prima facie showing of injury, loss, or harm by a criminal agency. [Citation.] In every case, once the necessary quantum of independent evidence is present, the defendant's extrajudicial statements may then be considered for their full value to strengthen the case on all issues. [Citations.]" (*Alvarez, supra,* 27 Cal.4th at p. 1171.)

### 3. Elements of the Offense

Section 20001, subdivision (a) provides: "The driver of a vehicle involved in an accident resulting in injury to a person, other than himself or herself, or in the death of a person shall immediately stop the vehicle at the scene of the accident and shall fulfill the requirements of Sections 20003 and 20004." Section 20003 requires the driver of any vehicle involved in an accident resulting in injury to or death, to provide identifying information and reasonable assistance to any injured person, and section 20004 requires the driver of any vehicle involved in an accident resulting in a death to report the accident to law enforcement.

Although a violation of section 20001 is "commonly referred to as 'hit and run,' " "[t]he gravamen of a section 20001 offense . . . is not the initial injury of the victim, but leaving the scene without presenting identification or rendering aid." (*People v. Escobar* (1991) 235 Cal.App.3d 1504, 1507, 1509.)

"[T]here need not necessarily be some contact between defendant's vehicle and that of another for a defendant to be 'involved in an accident' under section 20001." (*People v. Bammes* (1968) 265 Cal.App.2d 626, 631.) In fact, "[o]ne can be involved under section 20001 in an accident without being its legal cause." (*Ibid.*) "The duties imposed by the Vehicle Code . . . are imposed upon the driver whether or not he is responsible for the accident." (*Id.* at p. 632; see also *People v. Braz* (1998) 65 Cal.App.4th 425, 432 ["Section 20001, subdivision (a) describes a standard of conduct for drivers who are involved in accidents causing injury to other persons, whether or not the drivers are responsible for the accident."].)

### 4. Analysis

Defendant contends that without his out-of-court statements there was no evidence that his car struck Jackson or that his driving "somehow influence[d] Ms. Jackson, causing her to fall." He argues that without his out-of-court statements, "the evidence showed no more than [his] concurrent travel past Ms. Jackson and Mr. Nelson and presence near the scene where Ms. Jackson fell." Thus, he claims, there was no evidence that he was "involved in" the accident (§ 20001, subd. (a)) apart from his out-of-court statements. We disagree.

Even without defendant's out-of-court statements, the evidence permitted "an inference of criminal conduct." (*Alvarez, supra,* 27 Cal.4th at p. 1171.) Contrary to defendant's suggestion, it would not have been speculative for the jury to find that his driving "somehow influence[d] Ms. Jackson, causing her to fall." The circumstantial evidence strongly suggested that Jackson's fall was directly related to the BMW's driving. Nelson had seen Jackson – an experienced bicyclist who had never before fallen

– riding behind him 10 to 15 seconds before he saw the BMW, which had veered into the bicycle lane and struck him. Nelson saw Jackson lying on the ground immediately afterwards. He also saw the BMW slow down then accelerate away. These facts, alone, provided a basis upon which the jury could infer that the BMW was "involved in" Jackson's fall (§ 20001, subd. (a)), whether because the BMW struck Jackson, because it swerved into Jackson, or because Jackson swerved into its path.

Moreover, defendant's actions exhibited a consciousness of guilt. Following the accident, defendant began keeping the BMW in his garage, and he began driving a different car. This conduct further supported the inference that defendant had been "involved in" an accident that caused Jackson's injuries. (§ 20001, subd. (a).)

Because there was "independent proof" of defendant's criminal act apart from his out-of-court statements (*Alvarez, supra,* 27 Cal.4th at p. 1171), there was no violation of the corpus delicti rule.

### B.      *Ineffective Assistance of Counsel*

Defendant presents two arguments in support of his claim that he was denied the effective assistance of counsel. First, defendant contends trial counsel had a conflict of interest because he revealed damaging information to the prosecution – the fact that defendant had given him the mirror, in a brown paper bag, two years after the incident – and then told the jury the same information at trial, through a stipulation. Second, defendant contends trial counsel should have objected or moved to strike testimony about defendant's suspended driver's license.

#### 1.      Legal Standards

A defendant who presents a claim of ineffective assistance of counsel on appeal must show that the performance of his trial counsel was deficient, and that he was prejudiced thereby. (*Strickland v. Washington* (1984) 466 U.S. 668, 686-687 (*Strickland*); *People v. Anderson* (2001) 25 Cal.4th 543, 569.) "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors,

9

the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland*, *supra*, at p. 694.)  "Thus, to be entitled to reversal of a judgment on grounds that counsel did not provide constitutionally adequate assistance, the petitioner must carry his burden of proving prejudice as a 'demonstrable reality,' not simply speculation as to the effect of the errors or omissions of counsel.  [Citation.]" (*People v. Williams* (1988) 44 Cal.3d 883, 937.)

"Reviewing courts defer to counsel's reasonable tactical decisions in examining a claim of ineffective assistance of counsel [citation], and there is a 'strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.' [Citation.]" (*People v. Lucas* (1995) 12 Cal.4th 415, 436-437 (*Lucas*).)  "We have repeatedly stressed 'that "[if] the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged[,] . . . unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation," the claim on appeal must be rejected.' [Citations.]" (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266-267 (*Mendoza Tello*).)

### 2.    The Mirror – Proceedings Below

The prosecution filed a motion in limine seeking to exclude the side mirror and expert testimony regarding the side mirror.  The prosecution argued that there was a gap in the chain of custody and that therefore, "[a]bsent testimony from the Defendant, the mirror and results of any examination of the mirror should be excluded for lack of proper foundation."  The prosecution noted that it had no evidence that the mirror came from defendant's vehicle and that the mirror had not been submitted to law enforcement until about 28 months after the incident.

In the motion, the prosecution also noted its concern that trial counsel had become "a relevant and material witness" regarding the mirror.  The motion included, as an exhibit, a letter from trial counsel to the prosecutor.  In the letter, trial counsel explained

that his office had obtained the mirror in a paper bag on July 13, 2011, and that the mirror had remained in that bag, in a locked drawer, in his office. Trial counsel stated, "Prior to my obtaining said mirror it was removed from the subject vehicle soon after the incident by unprotected hands and stored by an unnamed attorney."

The prosecution's motion also included a report from an investigator who had interviewed trial counsel. Trial counsel told the investigator that defendant had brought him the mirror on July 13, 2011. However, trial counsel refused to disclose the identity of the person who had removed the mirror from defendant's vehicle, citing the attorney-client privilege.

During a hearing on motions in limine, the prosecutor reiterated her concerns about the mirror's authentication and its chain of custody. She also argued that trial counsel had become a material witness.

Trial counsel noted that he was defendant's third attorney and that he had disclosed the mirror to the prosecution because he had an ethical obligation to do so. He asserted that expert testimony would show that the mirror had come from defendant's car, as his expert would testify that the jagged edges, wire cuts, and paint all matched. He denied that he would need to be a witness and suggested that the parties stipulate that the mirror had not been in the prosecution's possession.

The trial court took the matter under submission and addressed the matter again the following day. The trial court noted that the prosecutor had two concerns: the chain of custody, and the fact that trial counsel was "in the middle of that chain of custody." The court noted that trial counsel had been placed in an ethical "catch-22." The trial court asked the parties to work out a stipulation regarding the mirror. Trial counsel agreed. The prosecutor reiterated her concerns about the chain of custody, but she agreed to try to work out a stipulation that would "address the chain of custody issues." Trial counsel acknowledged that if the mirror was admitted, the prosecution would likely exploit the two-year gap between the accident and the defense's disclosure of the mirror,

11

and he opined that a stipulation would ensure that the jury understood he had performed ethically. The trial court instructed the prosecutor to "draft something" that trial counsel would "feel[] comfortable" about signing.

During trial, the jury was read the following stipulation: "On June 16th of 2011, the Law Office of Daniel Jensen retained an expert for the scientific examination of a car mirror for trace evidence. On July 13th of 2011, Mr. Jensen received a car mirror from his client, defendant Robert Paul Schiro. [¶] The mirror was provided to Mr. Jensen in a brown paper bag. [¶] At some point in July '11, Mr. Jensen verbally notified the previously assigned deputy district attorney that Mr. Jensen had obtained the car mirror. [¶] On July 28th of 2011, Mr. Jensen provided a car mirror to Peter Barnett of Forensic Science Associates. [¶] The brown paper bag that housed the mirror was not provided to Peter Barnett. Neither Mr. Jensen [n]or Mr. Barnett is aware of the whereabouts of the brown paper bag. [¶] In late August of 2011, a mirror was delivered to the office of the sheriffs from Mr. Barnett."

The mirror was introduced into evidence during the defense case, over the prosecutor's objection.

During arguments to the jury, the prosecutor noted that the jury had been instructed that it could find defendant "was aware of his guilt" if he tried to hide evidence. (See CALCRIM No. 371.) The prosecutor further noted, "And there's the mirror that magically appeared two years later."

In his argument, trial counsel asserted that the mirror could not have broken off in a collision with a bicyclist. Trial counsel noted that the prosecution failed to bring in any experts to contradict the defense expert testimony about the mirror. He noted that the prosecution could try to argue that "this isn't the mirror," but that it matched perfectly and had been in the defense's possession.

12

### 3.    The Mirror – Analysis

Defendant contends trial counsel created a conflict of interest with defendant when he told the prosecution – and then the jury, through the stipulation – that defendant had given him the mirror, in a brown paper bag, two years after the incident.  Defendant asserts trial counsel was not effective because he provided damaging evidence and made himself a witness against defendant.

"[C]laims of Sixth Amendment violation based on conflicts of interest are a category of ineffective assistance of counsel claims that, under *Strickland, supra,* 466 U.S. at page 694, generally require a defendant to show (1) counsel's deficient performance, and (2) a reasonable probability that, absent counsel's deficiencies, the result of the proceeding would have been different.  [Citations.]  In the context of a conflict of interest claim, deficient performance is demonstrated by a showing that defense counsel labored under an actual conflict of interest '*that affected counsel's performance*—as opposed to a mere theoretical division of loyalties.'  [Citations.] '[I]nquiry into actual conflict [does not require] something separate and apart from adverse effect.'  [Citation.]  'An "actual conflict," for Sixth Amendment purposes, is a conflict of interest that adversely affects counsel's performance.'  [Citation.]"  (*People v. Doolin* (2009) 45 Cal.4th 390, 417-418.)

Defendant contends that trial counsel should not have accepted the mirror from defendant because trial counsel thereby became "at least a potential witness with regard to the chain of custody."  However, trial counsel had an obvious tactical reason for accepting the mirror from defendant:  to have the mirror analyzed by experts and introduce the mirror into evidence, in order to show that it could not have been broken in a collision with a bicyclist.  The defense case relied heavily on the expert testimony that the mirror would have folded in, rather than broken, if it had actually hit Jackson. Without that expert testimony, the evidence that defendant had collided with Jackson would have been unrefuted.  With the expert testimony, defendant was able to argue that

13

he did not collide with Jackson and was unaware that he was leaving the scene of an accident resulting in her injury.

Defendant claims trial counsel should have had an investigator accept the mirror, so that trial counsel himself would not be placed within the chain of custody and would not need to reveal that defendant was the source of the mirror. However, whether the mirror was in possession of an investigator or trial counsel, the defense would have been required to show that the mirror was "in fact the evidence found at the scene of the crime, and that between receipt and analysis there ha[d] been no substitution or tampering. . . ." (*People v. Riser* (1956) 47 Cal.2d 566, 580, overruled on other grounds in *People v. Morse* (1964) 60 Cal.2d 631, 649.) Thus, the defense would still have had to show that the mirror actually came from defendant's car. By telling the prosecution, court, and jury that defendant had provided the mirror to trial counsel, the defense was able to establish that foundational fact and put on the expert witnesses to testify that the mirror had likely broken off in defendant's garage rather than in a collision with Jackson.

Although the attorney-client privilege arguably would apply to defendant's conduct in providing the mirror to trial counsel, defendant impliedly waived the privilege in order to ensure the mirror and expert testimony were admitted into evidence. (See Evid. Code, § 912.) As stated previously, the entire defense theory rested on the mirror and the expert testimony, but the defense had to overcome the prosecution's chain-of-custody objection in order to have the mirror admitted into evidence. The record indicates that trial counsel believed he could get the mirror and expert testimony admitted into evidence only if the defense established defendant's car was the source of the mirror. The fact that defendant provided the mirror to trial counsel established that important link in the chain of custody and bolstered the defense argument in favor of admitting the mirror and expert testimony. We presume trial counsel advised defendant of the tactical reasons for revealing defendant as the source of the mirror (see *People v. Alcala* (1992)

14

4 Cal.4th 742, 805) and that defendant agreed to waive the attorney-client privilege in order to further his defense.[4]

For similar reasons, we do not agree with defendant that by entering into the stipulation, trial counsel "effectively became a witness against his own client." As noted, the trial court asked the parties to work out a stipulation about the chain of custody so the defense could introduce the mirror into evidence over the prosecution's objection. Trial counsel made a reasonable tactical choice to enter into the stipulation, deciding that the benefits of introducing the mirror and expert testimony outweighed any detrimental effect of the jury learning that defendant had retained the mirror for two years. (See *Lucas, supra,* 12 Cal.4th at pp. 436-437.)

Defendant claims that the stipulation was unnecessary, arguing that the prosecution's chain-of-custody objection was meritless because other evidence proved the mirror could only have come from defendant's car. Defendant points to the testimony of the criminalist, Peter Barnett, who explained that the broken mirror fit together with the piece on the car "like a jigsaw puzzle." While an item of evidence may be admitted over a chain-of-custody objection where the evidence "strongly supports a conclusion" that the item was not replaced, altered or tampered with (*People v. Hall* (2010) 187 Cal.App.4th 282, 295-296), in this case the trial court reasonably resolved the parties' dispute by asking them to work out a stipulation about the source of the mirror. (See *People v. Catlin* (2001) 26 Cal.4th 81, 134 [trial court's decision to admit evidence over a chain-of-custody objection is based on an "exercise of discretion"].) Trial counsel appears to have made a reasonable tactical decision to enter into the stipulation in order to ensure that the trial court permitted the defense to introduce the mirror into evidence.

---

[4] Nothing in the record indicates that defendant did not voluntarily provide the mirror to trial counsel for use in his defense or that defendant was not properly advised the jury would learn he provided the mirror to trial counsel. Such claims would need to be made in a petition for writ of habeas corpus. (See *People v. Pope* (1979) 23 Cal.3d 412, 426.)

Ultimately, defendant's complaint centers on the fact that that the stipulation told the jury that defendant had given trial counsel the mirror in a brown paper bag. Defendant contends trial counsel should have entered into "a less damning stipulation" – that is, one that did not suggest defendant engaged in some sort of "skullduggery" but instead informed the jury that defendant produced the mirror "in good faith, on the advice of counsel." The record does not shed light on the reasons why trial counsel agreed to a stipulation that included facts about defendant's delivery of the mirror to him in a brown paper bag, but we can surmise that trial counsel and/or the prosecutor did so because an item's packaging is often a factor in establishing chain of custody. (See, e.g., *People v. Lewis* (1987) 191 Cal.App.3d 1288, 1298-1299 [chain of custody established where items were delivered to crime lab "in sealed packages, identified by serial numbers" and were "still in a sealed condition" when received by the criminalist.) On this record, we cannot conclude that trial counsel was ineffective simply because he agreed to the stipulation's inclusion of the challenged details. (See *Mendoza Tello, supra,* 15 Cal.4th at pp. 266-267.)

Even assuming that reasonable trial counsel would have refused to accept the mirror from defendant, refused to reveal that defendant gave him the mirror, and successfully introduced the mirror into evidence without entering into the stipulation, defendant has failed to establish trial counsel's ineffectiveness. The evidence of defendant's guilt was overwhelming. Nelson saw a vehicle exactly matching defendant's vehicle driving in the bicycle lane right before seeing Jackson lying in the roadway, severely injured. Defendant admitted to several different people that his vehicle collided with a bicyclist. Defendant exhibited a consciousness of guilt when he stopped driving the BMW and started parking it inside his garage, and when he sought to replace the mirror with one from "out of [the] area." Further, although the prosecutor did argue that defendant exhibited a consciousness of guilt by failing to turn the mirror over for two years, the prosecutor did not exploit any of the details that defendant complains of – such

16

as the fact that defendant brought the mirror to trial counsel in a brown paper bag. Thus, we find no "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Strickland*, *supra*, 466 U.S. at p. 694.)

### 4. Failure to Object – Proceedings Below

Defendant filed a motion in limine seeking to exclude evidence of the reasons his driver's license was suspended – i.e., that he had a conviction for driving under the influence. The matter was resolved when the parties agreed that defendant would plead to count 4 and that count 5 would be dismissed.

Defendant did not specifically move to preclude evidence that his license was suspended at the time of the incident. In fact, he acknowledged that the prosecution was "free" to argue that if defendant knew that his license was suspended, he would have a "motive to fle[e] the scene of the accident."

Evidence that defendant's license was suspended at the time of the incident came in through the testimony of Paulsen and Deputy Gregory Taylor.

During cross-examination by trial counsel, Paulsen testified that she had worked for defendant by doing personal services, which included driving defendant, who was "not supposed to drive because his license had been suspended." When trial counsel asked Paulsen, "What did you think" when she heard defendant describe leaving the scene and driving by half an hour later, she stated, "I thought it was strange behavior. [¶] . . . [¶] I thought he probably did it because I knew he had a suspended license and he would drive anyway and sometimes he drinks and drives. [¶] . . . [¶] So I assumed that's why he left the scene." Following that testimony, the prosecutor asked the trial court to clarify whether Paulsen should be admonished not to mention the reasons defendant's driver's license was suspended. The trial court responded, "I don't think we want to put any[ ]more attention on it." Trial counsel agreed.

17

On direct examination by the prosecutor, Deputy Taylor testified that he had "look[ed] into the status of the defendant's driving privilege" and determined that defendant's driver's license was suspended at the time of the incident.

During arguments to the jury, the prosecutor reminded the jury that it "heard testimony that [defendant] was driving on a suspended license." She argued, "That provides him with an additional motive to flee the scene of the crime; may be one additional factor in showing his guilt."

### 5. Failure to Object – Analysis

Defendant contends that effective trial counsel would have objected or moved to strike Paulsen's and Deputy Taylor's testimony about defendant's suspended driver's license.

Defendant claims that Paulsen expressed an impermissible opinion about defendant's guilt and that Paulsen's testimony constituted inadmissible propensity evidence. (See *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 77 (*Coffman and Marlow*) ["A witness may not express an opinion on a defendant's guilt."]; Evid. Code, § 1101, subd. (a) [barring introduction of character evidence].) We disagree. As the Attorney General argues, Paulsen appeared to express an opinion about defendant's state of mind and motive, not his guilt of the charged offense. And, because Paulsen's testimony about defendant's suspended driver's license was relevant to defendant's motive, it was admissible under Evidence Code section 1101, subdivision (b).

Defendant contends that Deputy Taylor's testimony was hearsay because he did not have personal knowledge of whether defendant's driver's license was suspended. (See Evid. Code, § 1200, subd. (a).) The Attorney General asserts that this testimony was not offered to prove that defendant's driver's license was suspended – that is, "the truth of the matter stated" (*ibid.*), and thus that it was not hearsay. It is not clear on this record whether a hearsay objection would have been successful. It is possible that Deputy

18

Taylor could have produced records showing that defendant's license was suspended at the time, which might have been admissible as public records. (See Evid. Code, § 1280.)

Assuming, arguendo, that reasonable trial counsel would have objected and moved to strike the challenged testimony of Paulsen and Deputy Taylor, we find no "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Strickland*, *supra*, 466 U.S. at p. 694.) As noted above, there was overwhelming evidence that defendant was "involved in" an accident resulting in injury to Jackson. (§ 20001, subd. (a).) Thus, trial counsel's failure to object to the testimony about defendant's suspended driver's license does not "undermine confidence in the outcome" of this case. (*Strickland, supra,* 466 U.S. at p. 694.)

### C.      *Mistake of Fact Instruction*

Defendant contends the trial court erred by refusing to give a mistake-of-fact instruction. (See CALCRIM No. 3406.[5])

### 1.      **Proceedings Below**

Below, defendant argued that a mistake-of-fact instruction should be given because there was evidence that defendant "never believed he was involved in an accident." The prosecutor argued that the issue was covered by the instruction on the elements of the offense, which required the jury to find that defendant knew he was involved in an accident.

---

[5] CALCRIM No. 3406 provides: "The defendant is not guilty of *<insert crime[s]>* if (he/she) did not have the intent or mental state required to commit the crime because (he/she) [reasonably] did not know a fact or [reasonably and] mistakenly believed a fact. [¶] If the defendant's conduct would have been lawful under the facts as (he/she) [reasonably] believed them to be, (he/she) did not commit *<insert crime[s]>*. [¶] If you find that the defendant believed that *<insert alleged mistaken facts>* [and if you find that belief was reasonable], (he/she) did not have the specific intent or mental state required for *<insert crime[s]>*. [¶] If you have a reasonable doubt about whether the defendant had the specific intent or mental state required for *<insert crime[s]>*, you must find (him/her) not guilty of (that crime/those crimes)."

19

Noting that defendant told people that he had hit someone with his car, the trial court denied defendant's request for CALCRIM No. 3406, finding that there was no "substantial evidence to support that defense."

### 2. Analysis

"The trial court is charged with instructing upon every theory of the case supported by substantial evidence." (*People v. Montoya* (1994) 7 Cal.4th 1027, 1047.) Upon request, the trial court should give instructions that pinpoint a defense theory if the instruction is not argumentative or duplicative, and if the theory is supported by substantial evidence. (*Coffman and Marlow, supra,* 34 Cal.4th at p. 99.)

Mistake of fact is an established defense to a criminal charge. (*People v. Russell* (2006) 144 Cal.App.4th 1415 (*Russell*). A person who acts under a mistake of fact that would disprove criminal intent is excluded from the class of persons who are capable of committing crimes. (Pen. Code, § 26, subd. Three.) The mistake-of-fact instruction set forth in CALCRIM No. 3406 is premised on section 26, which excludes "[p]ersons who committed the act or made the omission charged under an ignorance or mistake of fact, which disproves any criminal intent" from the category of persons capable of committing crimes.

This court discussed the circumstances justifying a mistake-of-fact instruction in *Russell.* In *Russell,* the defendant was convicted of receiving a stolen motorcycle, which had been left outside a repair shop by its owner. At trial, the defendant claimed he did not know the motorcycle was stolen. (*Russell, supra,* 144 Cal.App.4th at p. 1419.) This court held the trial court should have instructed the jury on mistake of fact, as well as on the claim-of-right defense, because there was substantial evidence to support those defenses.

In *Russell,* this court described the evidence supporting the mistake-of-fact and claim-of-right instructions. "First, defendant testified repeatedly that he thought the motorcycle was abandoned." (*Russell, supra,* 144 Cal.App.4th at p. 1430.) "Second, the

20

condition and location of the motorcycle supported an inference that it had been abandoned" – there was evidence that the motorcycle was rusty, damaged, and unlocked. (*Ibid.*) "Third, defendant's conduct could lead the jury to conclude that he had a good faith belief the motorcycle had been abandoned" – he had asked a neighboring business about the motorcycle, tried to seek out the registered owner, invested time and money to fix it up, left it out in the open, and exhibited no consciousness of guilt when telling a police officer about how he had found it. (*Id.* at pp. 1430-1431.)

For similar reasons, this court concluded that the failure to give mistake-of-fact and claim-of-right instructions was prejudicial, under the harmless error test set forth in *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*). (*Russell, supra,* 144 Cal.App.4th at p. 1431.) Although the jury had been instructed that it had to find defendant knew the motorcycle was stolen, the mistake-of-fact and claim-of-right instructions "would have clarified the knowledge element by ensuring that the jury understood that a good faith belief, even an unreasonable good faith belief, would negate one of the elements of the offense." (*Id.* at p. 1433.) Moreover, the evidence of defendant's guilt was not overwhelming, as there was "relatively strong" evidence that defendant believed the motorcycle had been abandoned. (*Ibid.*)

In the instant case, even assuming that a mistake-of-fact instruction should have been given upon defendant's request, any error was harmless. *Russell* is distinguishable because the defendant in *Russell* displayed no conduct indicating anything other than innocent belief the motorcycle was abandoned. Here, defendant admitted to others that he had hit a bicyclist. He showed a consciousness of guilt by attempting to hide the BMW and by trying to obtain a new mirror from "out of [the] area." Moreover, other jury instructions informed the jury that it could not convict defendant of the offense unless he "knew that he had been involved in an accident that injured another person or knew from the nature of the accident that it was probable that another person had been injured." (See CALCRIM No. 2140.) Thus, under the circumstances of this case, it is

21

not reasonably probable defendant would have obtained a more favorable result if the jury had been instructed on the mistake-of-fact defense.  (See *Watson, supra,* 46 Cal.2d at p. 836; *Russell, supra,* 144 Cal.App.4th at p.1433.)

## DISPOSITION

The judgment is affirmed.


_____

BAMATTRE-MANOUKIAN, J.


WE CONCUR:


_____

ELIA, ACTING P.J.


_____

MÁRQUEZ, J.